**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| In re: | Bankruptcy Case No. 18-33707 |
| Diocese of Winona-Rochester, | Chapter 11 Case |
| Debtor. | |

---

| | |
|---|---|
| DW Harrow & Associates, LLC, as Trustee of the Diocese of Winona-Rochester Settlement Trust, | Adversary Proc. No. 18-03094 |
| Plaintiff, | |
| v. | |
| United States Fire Insurance Company, et al., | |
| Defendants. | |

---

## SECOND AMENDED COMPLAINT

Plaintiff DW Harrow & Associates, LLC, as Trustee of the Diocese of Winona-Rochester Settlement Trust (respectively, the "**Trustee**" and "**Trust**"), by and through its attorneys, alleges as follows against Defendant United States Fire Insurance Company ("**U.S. Fire**" or "**Defendant**"):

## BACKGROUND

1. This is an action for declaratory judgment and breach of contract seeking an adjudication of the rights, duties, and liabilities of the parties regarding certain insurance policies sold by U.S. Fire to the Diocese of Winona-Rochester (the "**Diocese**") as well as U.S. Fire's conduct relative to the duties it owes its insureds under those policies (the "**Policies**" as more specifically defined below). This action also seeks declaratory relief to determine the rights of the

Trustee for itself and on behalf of various claimants who have suffered and alleged sexual abuse against employees of the Diocese and have either obtained or received insurance rights in those insurance policies.

2. Effective May 25, 2013, the Minnesota Legislature enacted the Minnesota Child Victims Act, Minn. Stat. § 541.073 (the "**CVA**"), which altered, expanded, and in some circumstances eliminated the statute of limitations applicable to civil causes of action for damages based on sexual abuse.

3. As a result of that legislation, multiple claims and lawsuits were received by the Diocese alleging that the plaintiffs had suffered injuries resulting from sexual abuse by Diocesan employees, and that such injuries were caused by negligence of the Diocese. The claims at issue in this litigation alleged abuse during the period covered by policies sold to the Diocese by U.S. Fire (the "**Underlying Claims**"). The plaintiffs in the Underlying Claims alleged abuse by several Diocesan employees, including Father Thomas Adamson (the "**Adamson Claimants**") and other employees (the "**Non-Adamson Claimants**").

4. The Adamson Claimants and the Non-Adamson Claimants did in fact each suffer bodily injury during one or more of the policy periods of the Policies as a result of sexual abuse occurrences—i.e., accidents neither expected nor intended from the standpoint of the Diocese. To wit, because of the Diocese's negligence, each Non-Adamson Claimant and Adamson Claimant suffered sexual abuse during the period of one or more of the Policies at the hands of one or more persons under the employment and/or control of the Diocese.

5. Many of the Underlying Claims also named other entities within the Diocese as co-defendants, including various Parishes and Schools that are administered within the Diocese (the

"**Parishes and Schools**"). In addition, some of the Underlying Claimants also filed claims based on the same alleged conduct in the bankruptcy of the Archdiocese of Saint Paul and Minneapolis.

6. The Diocese declared bankruptcy on November 30, 2018, filing a voluntary petition under chapter 11 of the Bankruptcy Code. Following substantial litigation in the case styled *In re Diocese of Winona Rochester*, Bankruptcy Case No. 18-33707, as well as extended negotiations with creditors and claimants, the Diocese filed the Fifth Amended Joint Chapter 11 Plan of Reorganization of the Diocese of Winona-Rochester (the "**Plan of Reorganization**") on October 11, 2021. Dkt. No. 398. The Bankruptcy Court confirmed that plan on October 14, 2021, by entering a Confirmation Order which has since become non-appealable. Dkt. No. 405. The Plan of Reorganization became effective on October 29, 2021.

7. The Trustee, DW Harrow & Associates, LLC, now acts to administer the Diocese of Winona-Rochester Settlement Trust according to the terms of the Plan of Reorganization, the Confirmation Order, and the Trust Agreement.

8. The Trust was established to provide equitable compensation to the survivors of sexual abuse that have brought claims against the Diocese.

9. U.S. Fire sold multiple policies of insurance to the Diocese with policy periods spanning July 1, 1967, to July 1, 1978 (collectively, the "**Policies**"). The Policies provided comprehensive general liability coverage and encompassed both primary and excess policies. The Underlying Claims at issue in this litigation took place during the time period when the Diocese was insured by U.S. Fire.

10. The Diocese sought coverage from U.S. Fire under the Policies for allegations of abuse that took place within US Fire's applicable policy periods.

11. The claimants in the Underlying Claims have made multiple reasonable offers to settle with the Diocese within the applicable policy limits.

12. U.S. Fire, however, has rejected all settlement offers relating to the Underlying Claims to date.

13. U.S. Fire has consistently refused to defend and indemnify the Diocese and other Diocesan Entities (including Parishes and Schools) for the Underlying Claims that alleged abuse by Father Thomas Adamson (the "**Adamson Claims**").

14. U.S. Fire initially reserved its rights with respect to its obligations to defend and indemnify the Diocese for the Underlying Claims that alleged abuse by individuals other than Father Thomas Adamson (the "**Non-Adamson Claims**"). U.S. Fire later withdrew its reservation of rights for the Non-Adamson Claims and has agreed to defend and indemnify the Diocese against the Non-Adamson Claims. U.S. Fire has continued to deny coverage for some or all of the Parishes and Schools for the Non-Adamson Claims.

15. As a direct result of U.S. Fire's refusal to defend the Diocese and other Diocesan Entities in the Adamson Claims, the Diocese and the other Diocesan Entities were left without insurance coverage and faced personal exposure for the entire amount of any damage award, including the risk of substantial defense costs and the likelihood of significant adverse judgments. After providing U.S. Fire with notice of its intent to enter into such agreements, and following arms-length negotiations, the Diocese and certain Parishes and Schools, as appropriate, entered into agreements with the Adamson Claimants consistent with *Miller v. Shugart*, 316 N.W.2d 719 (Minn. 1982) (the "**Miller-Shugart Agreements**") that assigned to the Adamson Claimants any and all of the Diocese's and the other Diocesan Entities' claims and/or causes of action that they have under any insurance policy issued by U.S. Fire relating to or arising out of the Adamson

Claims, including without limitation, claims for bad faith, failure to indemnify and/or settle the claim, and failure to defend.

16. The Miller-Shugart Agreements entered into between the Diocese, the other Diocesan Entities, as appropriate, and the Adamson Claimants were reasonable and prudent in light of the Diocese's and the other Diocesan Entities' potential liability for the Adamson Claims and the scope and amount of potential damages. The Miller-Shugart Agreements were entered into at arms-length, free of any fraud or collusion.

17. Pursuant to the Plan of Reorganization, the Trustee has the right to litigate the insurance coverage dispute between U.S. Fire and the Adamson Claimants who have been assigned certain claims and/or causes of actions against U.S. Fire, with any recoveries to be distributed from the Trust to the survivors of sexual abuse.

18. Pursuant to the Plan of Reorganization, the Trustee also has the right to pursue U.S. Fire for coverage concerning the Diocese's, Parishes', and Schools' liabilities, if any, with respect to the Non-Adamson Claimants who elect to proceed as litigation claimants, with any recoveries to be distributed from the Trust to the survivors of sexual abuse.

19. Accordingly, the Trustee brings this action against U.S. Fire to adjudicate its rights and the rights of claimants in the Underlying Claims under the Policies sold by U.S. Fire to the Diocese.

## THE PARTIES

20. The Diocese is a Roman Catholic Diocese in Minnesota, with the episcopal see in the County of Winona, Minnesota. The Diocese was established on November 26, 1889, by Pope Leo XIII and encompasses twenty counties in southern Minnesota. The Parishes and Schools within these twenty counties in Southern Minnesota are affiliated with the Diocese. The Diocese,

and the particular Parishes and Schools on behalf of which insurance coverage is sought from U.S. Fire for the Underlying Claims, are referred to herein as the "**Diocesan Entities**."

21. U.S. Fire is a corporation organized under the laws of Delaware with its principal place of business in Morristown, New Jersey. Upon further information and belief, U.S. Fire operates in the State of Minnesota and sold insurance policies providing coverage to the Diocesan Entities for certain time periods during which the underlying claimants allege abuse.

22. DW Harrow & Associates, LLC is the Trustee of the Diocese of Winona-Rochester Settlement Trust (the "**Trust**") and operates the Trust in accordance with the terms of the Plan of Reorganization, the Confirmation Order, and the Trust Agreement.

**JURISDICTION AND VENUE**

23. This action was originally filed in Minnesota State Court in the Third Judicial District in the County of Winona, Case No. 85-CV-18-1439, and was removed to the United States Bankruptcy Court for the District of Minnesota on December 3, 2018.

24. This Court has jurisdiction over the causes of action in this case pursuant to 28 U.S.C. § 1334(b), which provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11." The Diocese filed a bankruptcy petition under Title 11 of the United States Code, and the insurance contracts are substantial assets of the Trust.

25. In addition, the Plan of Reorganization grants the bankruptcy court continuing jurisdiction "over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to this Chapter 11 case or the Plan, including, but not limited to, disputes arising out of or related to the Transferred Insurance

Interests or the rights and obligations of the Non-Settling Insurers on and after the Effective Date." *See* Dkt. No. 398 at 72, Section 16.1 (subsection 21) of the Plan of Reorganization.

26. This Court also has jurisdiction over this matter under 28 U.S.C. § 1332 because, exclusive of interest and costs, the value exceeds $75,000 and is between citizens of different states and foreign citizens. The Trust is located in Minnesota, while U.S. Fire's principal place of business is not in Minnesota, U.S. Fire is not incorporated in Minnesota, and U.S. Fire cannot otherwise be deemed a citizen of Minnesota.

27. Venue is proper in the United States Bankruptcy Court for the District of Minnesota because this is the district containing the courts in which the Underlying Cases are pending, i.e., the State of Minnesota. 28 U.S.C. § 103(1), § 1452(a).

28. The Trustee consents to the bankruptcy court entering final orders and judgments pursuant to Fed. R. Bankr. P. 7008.

## THE INSURANCE POLICIES PURCHASED BY THE DIOCESE

29. From July 1, 1967, to July 1, 1978, in consideration of premiums paid by the Diocese, U.S. Fire sold general liability insurance policies to the Diocese, as well as certain umbrella and/or excess liability policies (the "**Policies**").

30. Each of the Policies requires U.S. Fire to pay to or on behalf of the Diocese or other insureds all sums that those insureds become legally obligated to pay as damages because of bodily injury, as long as any part of the alleged injury took place during the applicable policy period.

31. Each of the Policies also requires U.S. Fire to pay all defense costs and expenses, including attorney's fees, incurred by the Diocese and other insureds in their investigation and defense of potentially covered claims. This obligation applies even if the allegations against the Diocese and other insureds are ultimately determined to be groundless, false, or fraudulent.

32. U.S. Fire sold Policy No. ML42768 to the Diocese with a policy period from July 1, 1967, to July 1, 1970 (the "**1967–70 Primary Policy**"). The 1967–70 Primary Policy provides comprehensive general liability coverage, including bodily injury coverage of $300,000 per-occurrence. The 1967–70 Primary Policy further includes the Parishes and Schools as additional insureds.

33. U.S. Fire sold Policy No. DCL176017 to the Diocese with a policy period from July 1, 1967, to July 1, 1970 (the "**1967–70 Excess Policy**"). The 1967–70 Excess Policy provides comprehensive general liability coverage, including bodily injury coverage, of $2,000,000 per occurrence excess of the $300,000 of per-occurrence underlying coverage provided in the 1967–70 Primary Policy. The 1967–70 Excess Policy further includes the Parishes and Schools as additional insureds.

34. U.S. Fire sold Policy No. ML76766 to the Diocese with a policy period from July 1, 1970, to July 1, 1973 (the "**1970–73 Primary Policy**"). The 1970–73 Primary Policy provides comprehensive general liability coverage, including bodily injury coverage of $300,000 per-occurrence. The 1970–73 Primary Policy further includes the Parishes and Schools as additional insureds.

35. U.S. Fire sold Policy No. DCL536095 to the Diocese with a policy period from July 1, 1970, to July 1, 1973 (the "**1970–73 Excess Policy**"). The 1970–73 Excess Policy provides comprehensive general liability coverage, including bodily injury coverage, of $2,000,000 per-occurrence excess of the $300,000 of per-occurrence underlying coverage provided in the 1970–73 Primary Policy. The 1970–73 Excess Policy further includes the Parishes and Schools as additional insureds.

36. U.S. Fire sold Policy No. ML145245 to the Diocese with a policy period from July 1, 1973, to July 1, 1976 (the "**1973–76 Primary Policy**"). The 1973–76 Primary Policy provides comprehensive general liability coverage, including bodily injury coverage of $300,000 per-occurrence. The 1973–76 Primary Policy further includes the Parishes and Schools as additional insureds.

37. U.S. Fire sold Policy No. DCL1861307 to the Diocese with a policy period from July 1, 1973, to July 1, 1976 (the "**1973–76 Excess Policy**"). The 1973–76 Excess Policy provides comprehensive general liability coverage, including bodily injury coverage, of $2,000,000 per-occurrence excess of the $300,000 of per-occurrence underlying coverage provided in the 1973–76 Primary Policy. The 1973–76 Excess Policy further includes the Parishes and Schools as additional insureds.

38. U.S. Fire sold Policy No. ML236050 to the Diocese with a policy period from July 1, 1976, to July 1, 1977 (the "**1976–77 Primary Policy**"). The 1976–77 Primary Policy provides comprehensive general liability coverage, including bodily injury coverage of $300,000 per-occurrence. The 1976–77 Primary Policy includes the Parishes and Schools as additional insureds.

39. U.S. Fire sold Policy No. 520-004686-5 to the Diocese with a policy period from July 1, 1976, to July 1, 1977 (the "**1976–77 Excess Policy**"). The 1976–77 Excess Policy provides comprehensive general liability coverage, including bodily injury coverage, of $2,000,000 per-occurrence excess of the $300,000 of per-occurrence underlying coverage provided in the 1976–77 Primary Policy. U.S. Fire also agreed to insure "all entities, Corporations, within Jurisdiction of Diocese of Winona where primary insurance is provided under U.S. Fire Policy ML-236050," including the Parishes and Schools.

40. U.S. Fire sold Policy No. ML237409 to the Diocese with a policy period from July 1, 1977, to July 1, 1978 (the "**1977–78 Primary Policy**"). The 1977–78 Primary Policy provides comprehensive general liability coverage, including bodily injury coverage of $500,000 per-occurrence. The 1977–78 Primary Policy further includes the Parishes and Schools as additional insureds.

41. U.S. Fire sold Policy No. 520-227405-4 to the Diocese with a policy period from July 1, 1977, to July 1, 1978 (the "**1977–78 Excess Policy**"). The 1977–78 Excess Policy provides comprehensive general liability coverage, including bodily injury coverage, of $2,000,000 per-occurrence excess of the $500,000 of per-occurrence underlying coverage of the 1977–78 Primary Policy. U.S. Fire also agreed to insure "all, entities, Corporations, within jurisdiction of Diocese of Winona where primary insurance is provided under U.S. Fire Policy ML237409" as additional insureds, including the Parishes and Schools.

42. Each of the Policies is a Commercial General Liability ("CGL") policy comprised of industry-standardized policy forms.

43. The terms, limits, conditions, and existence of several of the Policies have been disputed by U.S. Fire, including the limits of the 1967–70 Primary Policy and the terms, limits, conditions, and existence of the 1967–70 Excess Policy, the 1970–73 Excess Policy, and the 1973–76 Excess Policy (collectively, the "**Lost Policies**").

44. The Diocesan Entities conducted a diligent search for copies of each of the Lost Policies but have been unable to locate complete copies of those policies. Nonetheless, the Diocesan Entities have collected substantial secondary evidence supporting the terms, limits, conditions, and existence of each of the Lost Policies. That secondary evidence includes annual

reports and minutes from Diocesan and Parish meetings and other evidence from historical Diocesan and Parish records and correspondence.

45. The substantial secondary evidence collected and produced in this action is sufficient to meet the Trustee's burden of establishing a prima facie case of the existence and terms of the Lost Policies under Minnesota law.

46. The 1967–70 Primary Policy, the 1967–70 Excess Policy, the 1970–73 Primary Policy, the 1970–73 Excess Policy, the 1973–76 Primary Policy, and the 1973–76 Excess Policy were issued as three-year policies but with separate annual periods. Any applicable aggregate limits of each of those policies applies separately to each annual period within the three-year policy.

47. The Diocese timely and fully paid all premiums due under the Policies and the Diocesan Entities have satisfied all requirements precedent to coverage.

**THE UNDERLYING CLAIMS AND THE PLAN OF REORGANIZATION**

48. The Underlying Claims include allegations against various Diocesan Entities. The claimants in the Underlying Claims allege that they suffered injuries resulting from sexual abuse, that the perpetrators of that sexual abuse were employees of Diocesan Entities and that the abuse and resulting injuries were caused by the negligence of the Diocesan Entities.

49. All of the claimants in the Underlying Claims for which the Trustee seeks insurance coverage from U.S. Fire allege that the sexual abuse that gave rise to their claims occurred between July 1, 1967, and July 1, 1978.

50. The Diocesan Entities timely notified U.S. Fire of each of the Underlying Claims and have fully cooperated with U.S. Fire's reasonable requests.

51. The Diocesan Entities have fulfilled all of their duties and conditions under each of the Policies with respect to the Underlying Claims.

52. The Underlying Claims allege bodily injury and are covered by the Policies, and the Diocesan Entities are entitled to all benefits thereunder.

53. Under the terms of the Plan of Reorganization, the Trust will pursue coverage for any settlements and judgments obtained by the Underlying Claimants. This includes any settlements or judgments consistent with *Miller v. Shugart* on behalf of the claimants against U.S. Fire. Any recoveries by the Trust from U.S. Fire will become assets of the Trust and will be distributed to survivors pursuant to the Trust Distribution Plan.

**THE NON-ADAMSON CLAIMS**

54. There are approximately 54 outstanding Non-Adamson Claims pending against the Diocesan Entities. U.S. Fire rejected reasonable settlement offers within policy limits made by the Non-Adamson Claimants to the Diocesan Entities, resulting in the Diocesan Entities being exposed to judgments above policy limits.

55. U.S. Fire has belatedly agreed to defend and indemnify, without reservation, the Diocese for the subset of the Underlying Claims that do not involve allegations of abuse by Thomas Adamson.

56. By withdrawing any reservation of rights with respect to the Non-Adamson Claims, U.S. Fire has conceded that it has waived any coverage defenses with respect to defense or indemnity of those claims and has continued to operate as if it has waived any such defenses. Furthermore, by agreeing to defend and indemnify the Non-Adamson Claims without reservation, U.S. Fire has, as a matter of law, waived all coverage defenses against defense or indemnity of the Non-Adamson Claims.

57. U.S. Fire has separately denied coverage to several Parishes and Schools for certain policy years with respect to the Non-Adamson Claims on the grounds that U.S. Fire does not believe that those Parishes and Schools were "additional insureds" within the meaning of the Policies.

58. Despite withdrawing any reservation of rights with respect to the Non-Adamson Claims against the Diocese, and thereby waiving any coverage defenses regarding those claims, certain coverage issues still remain outstanding regarding the scope and coverage of the U.S. Fire Policies as to the Non-Adamson Claims that implicate the rights of the Trustee and impact the amounts to be disbursed to claimants under the Plan of Reorganization. These issues include, without limitation, the existence, limits, and terms of the Lost Policies, as well as additional insured coverage for the Parishes and Schools under the Policies.

**THE ADAMSON CLAIMS**

59. U.S. Fire has repeatedly denied coverage and refused to defend the Diocesan Entities for the subset of the Underlying Claims that involve allegations of abuse by Thomas Adamson. There were approximately 26 Adamson Claims filed against the Diocesan Entities that alleged abuse during the U.S. Fire policy period.

60. As a direct result of U.S. Fire's complete denial of coverage, the Diocese and the other Diocesan Entities faced a risk of personal exposure for the entire amount of any damage award from the Adamson Claims.

61. Following the denial of coverage by U.S. Fire, mediation sessions were conducted in late June 2021 among the Adamson Claimants and the Diocese, as well as several parishes named as co-defendants in the Adamson Claims, including St. Theodore – Albert Lea ("**St.**

**Theodore**"), St. Adrian – Adrian ("**St. Adrian**"), and St. Francis of Assisi – Rochester ("**St. Francis**"), as well as Lourdes High School and Rochester Catholic Schools.

62. The mediation sessions were supervised and facilitated by Judge Janice M. Symchych (Ret.), who was appointed mediator by the Bankruptcy Court in a May 19, 2021, Amended Order Regarding Scope of Mediation. Dkt. 273.

63. As a result of these arm's-length negotiations that were free of any fraud or collusion, the Diocese, certain Parishes and Schools, as appropriate, and the Adamson Claimants reached individual Miller-Shugart Agreements to settle the Adamson Claims in accordance with *Miller v. Shugart* and *King's Cove Marina LLC v. Lambert Commercial Construction LLC*, 958 N.W. 2d 310 (Minn. 2021).

64. Prior to entering the Miller-Shugart Agreements with the Adamson Claimants, the Diocese provided notice to U.S. Fire of its intent to enter into such agreements.

65. As part of the Miller-Shugart Agreements, the Adamson Claimants covenanted not to execute on the stipulated judgments against the Diocese and the other Diocesan Entities and to seek recovery on such stipulated judgments only against U.S. Fire. In exchange, the Diocese and certain Parishes and Schools, as appropriate, agreed to assign to each Adamson Claimant any and all of their claims and/or causes of action that they have under any insurance policy issued by U.S. Fire relating to or arising out of the Adamson Claims, including without limitation, claims for bad faith, failure to indemnify and/or settle the claim, and failure to defend.

66. For the Adamson Claims that involved multiple defendants or that implicated non-defendant third parties to the action, the parties to the settlements allocated the Adamson Claimants' damages between the Diocese, co-defendants, and third parties following arms-length negotiations among those parties.

67. The Adamson Claimants reached the following settlements with the Diocese, or with the Diocese and certain Parishes and Schools, as appropriate, that the Trust now seeks to recover against US Fire in this action:[1]

a. Claimant 19/Doe 527: $1,500,000, with $1,050,000 (70%) allocated to the Diocese; $375,000 (25%) allocated to St. Francis of Assisi; and $75,000 (5%) allocated to Rochester Catholic Schools.

b. Claimant 22/Doe 263: $5,400,000, with $4,320,000 (80%) allocated to the Diocese and $1,080,000 (20%) allocated to St. Theodore.[2]

c. Claimant 23/ Doe 219: $600,000, with $390,000 (65%) allocated to the Diocese; and $210,000 (35%) allocated to the Archdiocese of Saint Paul and Minneapolis.

d. Claimant 36/Doe 405: $6,400,000, with $3,840,000 (60%) allocated to the Diocese and $2,240,000 (35%) allocated to St. Francis of Assisi; and $320,000 (5%) to Rochester Catholic Schools.

e. Claimant 48/Doe 229: $1,300,000, with $780,000 (60%) allocated to the Diocese; $455,000 (35%) allocated to St. Francis of Assisi; and $65,000 (5%) allocated to Rochester Catholic Schools.

f. Claimant 51/Doe 224: $1,500,000, with $1,125,000 (75%) allocated to the Diocese and $375,000 (25%) allocated to St. Francis of Assisi.

---

[1] In addition to the Miller-Shugart Agreements listed herein, the Diocese and certain Parishes and Schools, as appropriate, also entered into Miller-Shugart Agreements with certain other Adamson Claimants. The Trustee, however, is not seeking to enforce the Miller-Shugart Agreements involving Adamson Claims that solely alleged abuse after January 1, 1974 or any Miller-Shugart Agreements involving Adamson Claimants who are now deceased.

[2] The Claimants presented evidence at the mediation showing that the abuse of Claimant 22 occurred after July 1, 1967. No party presented evidence to the contrary.

g. Claimant 67/Doe 254: $1,300,000, with $975,000 (75%) allocated to the Diocese; $325,000 (25%) allocated to St. Francis of Assisi; and $0 (0%) allocated to Rochester Catholic Schools.[3]

h. Claimant 70/Doe 280: $5,500,000, with $4,400,000 (80%) allocated to the Diocese and $1,100,000 (20%) allocated to St. Theodore.[4]

i. Claimant 72/Doe 286: $1,300,000, with $1,040,000 (80%) allocated to the Diocese and $260,000 (20%) allocated to St. Theodore.[5]

j. Claimant 75/Doe 399: $9,000,000, with $5,400,000 (60%) allocated to the Diocese; $2,250,000 (25%) allocated to St. Francis of Assisi; and $1,350,000 (15%) allocated to Lourdes High School.

k. Claimant 90/Doe 285: $1,900,000, with $1,330,000 (70%) allocated to the Diocese; $475,000 (25%) allocated to St. Francis of Assisi; and $95,000 (5%) allocated to Rochester Catholic Schools.

l. Claimant 117/Doe 248: $5,250,000, with $4,462,500 (85%) allocated to the Diocese and $787,500 (15%) allocated to St. Theodore.[6]

---

[3] Claimant 67 also alleged claims pertaining to sexual abuse by Fr. Joseph Cashman. The settlement amount reached herein settles only Claimant 67's claims pertaining to the abuse by Fr. Thomas Adamson ("**Adamson**"), not his claims pertaining to the abuse by Fr. Cashman.

[4] The Claimants presented evidence at the mediation showing that the abuse of Claimant 70 occurred after July 1, 1967. No party presented evidence to the contrary.

[5] The Claimants presented evidence at the mediation showing that the abuse of Claimant 72 occurred after July 1, 1967. No party presented evidence to the contrary.

[6] The Claimants presented evidence at the mediation showing that the abuse of Claimant 117 occurred after July 1, 1967. No party presented evidence to the contrary.

m. Claimant 121/Doe 472: $4,000,000, with $2,400,000 (60%) allocated to the Diocese; $1,400,000 (35%) allocated to St. Francis of Assisi; and $200,000 (5%) allocated to Rochester Catholic Schools.[7]

n. Claimant 129/Doe 225: $6,300,000, with $3,780,000 (60%) allocated to the Diocese; $2,205,000 (35%) allocated to St. Francis of Assisi; and $315,000 (5%) allocated to Rochester Catholic Schools.

68. These settlement amounts are the result of arms-length negotiations, free of any collusion or fraud, between the Diocese, certain Schools and Parishes, as appropriate, and the Adamson Claimants. The settlement amounts were reasonable and prudent in light of the Diocese's, Parishes', and Schools' potential liability for the Adamson Claims and the scope and amount of the Adamson Claimants' damages.

69. Coverage under the U.S. Fire Policies exists for the Adamson Claims, and the Adamson Claimants' judgments against the Diocese, Parishes, and Schools are therefore collectible from U.S. Fire under the Policies at issue in this action.

## COUNT I

### Breach of Contract: Duty to Defend Adamson Claims

70. The Trustee hereby incorporates paragraphs 1 through 69 of this Second Amended Complaint, as if fully set forth herein.

71. Defendant U.S. Fire is obligated to pay on behalf of the Diocesan Entities the costs those entities incurred and will incur to defend all of the underlying Adamson Claims.

[7] Claimant 121 also alleged claims pertaining to sexual abuse by Dennis Ludwig. The settlement amount reached herein settles only Claimant 121's claims pertaining to the abuse by Adamson, not his claims pertaining to the abuse by Dennis Ludwig.

72. Defendant U.S. Fire has refused to accept or acknowledge the scope of its duty to defend in each of the Adamson Claims. As a result, the Diocese and the other Diocesan Entities have paid defense costs that should have been paid by Defendant U.S. Fire.

73. As a direct result of Defendant U.S. Fire's breach, the Diocesan Entities and the Trustee have been and will continue to be deprived of the full benefits of the Policies sold to the Diocese and for which the Diocese paid substantial premiums.

74. As a direct result of Defendant U.S. Fire's breach, the Diocesan Entities and the Trustee have been forced to incur and will continue to incur additional consequential damages, including without limitation, attorneys' fees and other expenses in bringing this action.

**COUNT II**

**Declaratory Judgment: Reasonableness and Enforceability of the Miller-Shugart Agreements**

75. The Trustee hereby incorporates paragraphs 1 through 74 of this Second Amended Complaint, as if fully set forth herein.

76. Coverage exists under the Policies for the Adamson Claims because they allege and seek to hold the Diocese and certain Parishes and Schools, as appropriate, liable for bodily injury caused by an occurrence during the period of the Policies or, in the alternative, to the extent necessary to state a claim, such bodily injury caused by an occurrence did in fact take place during the U.S. Fire policy periods.

77. Due to Defendant U.S. Fire's complete denial of coverage for the Adamson Claims, including U.S. Fire's refusal to accept one or more settlement offers by the Adamson Claimants within-policy limits, the Diocese and certain Parishes and Schools, as appropriate, faced personal exposure for the entire amount of any damage award that may be entered against them in the Adamson Claims.

78. In order to avoid potentially catastrophic judgments in the Adamson Claims, the Diocese and certain Parishes and Schools, as appropriate, entered into Miller-Shugart Agreements with the Adamson Claimants.

79. Defendant U.S. Fire has failed and refused to pay those Miller-Shugart Agreements.

80. The Diocese provided notice to Defendant U.S. Fire of its intention to enter into the Miller-Shugart Agreements.

81. Despite an invitation to participate in the settlement negotiations between the Diocese, certain Parishes and Schools, as appropriate, and the Adamson Claimants, Defendant U.S. Fire declined to participate in those negotiations.

82. The negotiations between the Diocese, certain Parishes and Schools, as appropriate, and the Adamson Claimants were conducted in good faith and at arm's length, and the negotiations was free of any fraud or collusion.

83. A reasonable and prudent person in the position of the Diocese, and the Parishes and Schools, as appropriate, would have settled the Adamson Claims for the amounts set forth in the stipulated judgments based on the allegations of the Adamson Claims and the risk of an adverse judgment of liability if the Adamson Claims were to go to trial.

84. U.S. Fire has indicated that it does not believe that the amounts set forth in the stipulated judgments are reasonable and that the Miller-Shugart Agreements are not enforceable.

85. The Trustee has a tangible legal interest in the reasonableness of the stipulated judgments and in the enforceability of the Miller-Shugart Agreements entered into between the Diocese, certain Parishes and Schools, as appropriate, and the Adamson Claimants, and U.S. Fire has an opposing interest.

86. An actual and justiciable controversy has arisen and currently exists between the Trustee and U.S. Fire regarding the enforceability of the Miller-Shugart Agreements and the reasonableness of the stipulated judgments entered into between the Diocese, certain Parishes and Schools, as appropriate, and the Adamson Claimants.

87. The Trustee is entitled to a declaration that the Miller-Shugart Agreements and stipulated judgments entered into between the Diocese, certain Parishes and Schools, as appropriate, and the Adamson Claimants are valid and enforceable against U.S. Fire because they are reasonable and prudent, and free of any collusion or fraud.

## COUNT III

### Declaratory Judgment: Existence, Terms, and Limits of the Lost Policies

88. The Trustee hereby incorporates paragraphs 1 through 87 of this Second Amended Complaint, as if fully set forth herein.

89. The Diocesan Entities conducted a diligent search for the Lost Policies but were unable to locate copies in their records. The Diocese requested that Defendant U.S. Fire search for and produce copies of the Lost Policies, but U.S. Fire has stated that it was also unable to locate copies of these policies.

90. Although the Trustee and the Diocesan Entities have been unable to locate actual copies of the Lost Policies, the Trustee has satisfied its burden of demonstrating the existence, limits, and terms of the Lost Policies on the basis of substantial secondary evidence.

91. The Trustee has a tangible legal interest in the existence, terms, and limits of the Lost Policies and the coverage they provide for the Underlying Claims. U.S. Fire has an opposing interest.

92. An actual and justiciable controversy has arisen and currently exists between the Trustee and U.S. Fire regarding the existence, terms, and limits of the Lost Policies.

93. The Trustee is therefore entitled to a declaration that (1) the 1967-70 Primary Policy provides general liability coverage under terms and conditions shown by the Trustee, that include bodily injury coverage of $300,000 per occurrence; (2) the 1967–70 Excess Policy provides general liability coverage under terms and conditions shown by the Trustee, that includes bodily injury coverage of $2,000,000 per occurrence excess of the underlying coverage provided in the 1967–70 Primary Policy; (3) the 1970-73 Excess Policy provides general liability coverage under terms and conditions shown by the Trustee, that includes bodily injury coverage of $2,000,000 per occurrence excess of the underlying coverage provided in the 1970-73 Primary Policy; (4) the 1973–76 Excess Policy provides general liability coverage under terms and conditions shown by the Trustee, that includes bodily injury coverage of $2,000,000 per occurrence excess of the underlying coverage provided in the 1973–76 Primary Policy; and (5) the other Diocesan Entities, including Parishes and Schools, are insured under each of the Policies.

**PRAYER FOR RELIEF**

94. WHEREFORE, the Trustee respectfully requests that this Court enter judgment against Defendant U.S Fire:

a. Awarding the Trustee actual money damages according to proof at trial, plus interest according to applicable law, that the Trustee and the Diocesan Entities have suffered as result of Defendant U.S. Fire's breach of its duty to defend the Adamson Claims;

b. Declaring that the Miller-Shugart Agreements entered into between the Diocese, certain Parishes and Schools, as appropriate, and the Adamson

Claimants were reasonable and prudent, free of any collusion and fraud, and therefore valid and enforceable against U.S. Fire;

c. Declaring that the Lost Policies provide general liability coverage and excess liability coverage under the terms, conditions, and limits shown by the Trustee;

d. Declaring that the Policies insure the other Diocesan Entities, including the Parishes and Schools; and

e. Granting such other and further relief as this Court deems just and proper, including awarding the Trustee the attorneys' fees and costs incurred by the Trustee in connection with this action.

Dated: January 28, 2022

**BURNS BOWEN BAIR LLP**

By: */s/ Timothy W. Burns*
Timothy W. Burns (admitted *pro hac vice*)
Jeff J. Bowen (admitted *pro hac vice*)
Jesse J. Bair (admitted *pro hac vice*)
10 E. Doty Street, Suite 600
Madison, Wisconsin 53703
T: 608-286-2808
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com

Andrew J. Glasnovich
Edwin H. Caldie
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
T: 612-235-1500
drew.glasnovich@stinson.com
ed.caldie@stinson.com

*Counsel for the Trustee*

**CERTIFICATE OF SERVICE**

The undersigned, under penalty of perjury, hereby states that he is counsel of record for Plaintiff and that on the 28th day of January 2022, he served a copy of the Second Amended Complaint and this Certificate of Service, via CM/ECF upon:

| | |
|---|---|
| Charles Spevacek<br>Meagher & Geer, PLLC<br>33 South Sixth Street, Suite 4400<br>Minneapolis, MN 55402<br><br>*Counsel for United States Fire Insurance Company* | Michael J. Cohen<br>Pamela J. Tillman<br>Meissner Tierney Fisher & Nichols S.C.<br>111 E. Kilbourn Avenue, 19th Floor<br>Milwaukee, WI 53202<br><br>*Counsel for United States Fire Insurance Company* |

*/s/Timothy W. Burns*